May it please the Court, my name is Gail Ivins, and I'm here representing Defendant Appellant Kendra Trice this morning. With me at Council table are Vincent Oliver, who is representing Co-Defendant Appellant Cedric DECOUD, and Richard Rome, who is representing Adra Israel. We have divided our time, Your Honor. We will take each five minutes to address the issues raised in our briefs and reserve five minutes for rebuttal. All right. So would you like me to kind of give you the sign so that your counsel don't have to pull you down? All right. You can go ahead. Your Honor, in Ms. Trice's brief, the issue of jury misconduct is raised. And the question for the Court is whether there was enough of a suggestion of either misconduct or a failure by way of an evidentiary hearing, or by allowing investigation by trial counsel. And I believe that the answer is yes. We don't have a lot of information at this stage, because the district court judge cut off that investigation, even though, according to the uncontested declaration of Chandra White, the juror, Juror Bailey, said to her, I don't want to give you my contact information, you know, have the defense lawyers contact me through the court. The district court judge did not give that information or allow defense counsel to obtain that information. And so they were not allowed to follow up on that information. She also did not bring Juror Bailey and or Chandra White into the courtroom for counsel to at least have them in front of them to ask questions at a hearing. And I think that the precedents of this Court make clear that some factual development, either by way of investigation or by way of a hearing before the Court, needed to occur. Well, essentially, the Court, correct me if I'm wrong, but essentially, obviously, at the time of the trial, the juror, Bailey, initiated contact with the Court. I think there were three questions that occurred in a row. And the last one was where she talked about her religious beliefs. And she was the one that initiated it. And there appeared to be a fairly lengthy discussion there. And then I think before she was excused, counsel for at least two of the defendants, I think, made some comment about, well, I'm concerned that she might be feeling some racial pressure or whatever, something along those lines. So then the judge called Juror Bailey back in, didn't say, is anyone making racial epitaphs to you or putting pressure under that way? But asked, I would say, an open-ended question. Are there any other reasons? Or are you feeling any other pressures or, you know, anything that you haven't told me? And the juror said, no, it's just what I told you, right? I think, Your Honor, that is a very important point. Because at Excerpt of Record 22, in the excerpts I filed, we find the actual question. And I think if we look at that actual question, it's clear that it doesn't really quite cover all of those eventualities. The question was, is there anything that happened in the jury room, in the jury room, in terms of anything that was said or done by any of the other jurors towards you that brought you in here today with this concern? And at the time, that probably seemed like a fairly complete question. But what we don't know is, were there things that happened outside the jury room? Were there things that the jurors were saying to each other? Were they making the kinds of racial jokes that have been frowned upon by other courts in this country that have led to factual development? That, the question was not phrased to a very exact level. Well, but you're not saying, okay, but with no evidence of racial jokes or anything, I don't think it would be proper for a trial judge to say, well, did anyone make racial jokes to you? No, it absolutely would not have been proper, I don't think, at this juncture. Which is why the problem in this case is that the court relied on what was an appropriate question at the time, to deny relief post-trial, once there was some additional evidence. And I think once the Chandra White declaration was submitted, it was incumbent upon the district court to allow some type of focused investigation or hearing, just to put that to rest, or to find out that there really was a problem. We don't know, standing here today, was it a serious problem or a minor problem? What did she mean? Because no one's asked her since the declaration was submitted. Well, the court was concerned and didn't feel that you overcame, that you were trying to go into the internal deliberations of the jurors, correct, which would not be admissible. That's correct. That is the near to, and I don't want to take too much of my co-counsel's time. One thing is that if there were a biased juror, if there had actually been, she said there was some type of suggestion of some type of racial issue. That's what we have from the declaration. But if what she meant by that was she had a group of jurors who, you know, made comments, we don't know. But if that had happened, that is not necessarily barred by 606B if what we discover from that is that there were a racially biased juror sitting on the jury. Because that was recognized in Henley, evidence of bias of a juror is something that they bring to the jury room. It's not something necessarily that is their deliberative process. And so 606B would not have excluded that evidence. So this Court actually need not address this big issue of is a racial bias in the jury room actually, you know, applying that to the facts. Is that external or internal? We aren't there yet. Where we are at this juncture before this Court is asking for a remand to go back to either have the hearing and ask those questions of Juror White and Juror Bailey and Chandra White, or to at least allow defense counsel to do the investigation that they wanted to do. Well, it seemed like a little bit, you know, just in my reading the record, it seemed to me that the Court made findings about the credibility of this Juror Bailey and how that all went and that it was at the time and that this Juror initiated it. And I don't think, it doesn't seem like the Court believed Chandra in terms of, and didn't Chandra testify at the trial? And if the jurors had believed Chandra, there would have been a different result as to some of the defendants. So, you know, I guess isn't a court entitled to say, okay, I saw you testify at the trial, you know, I saw this Juror at the time, I saw the demeanor of this Juror, he wanted to talk to me, all of the above. I know I'm taking a little bit of your time, so I won't cause that a problem, but I think this is an important issue. And basically said, hey, this Juror initiated the contact, we gave this Juror every opportunity to say everything that was wrong. I believed her, she was articulate, all of that. And then Chandra comes in later, who's related to, what, two of the defendants, and makes statements that the Court feels, I think essentially the Court didn't really find Chandra very credible. And why can't the Court do that, having all the experience that the Court had had of the whole trial, and having seen Bailey already firsthand, and under those circumstances, why can't the Court do that? Well, first of all, I don't think that this, I don't think that the Court necessarily had to find that there was necessarily a credibility issue between the two of them. Because as I pointed out, the Juror's answer to the very narrow question that Judge West asked at the request of trial counsel did not rule out the statement that she allegedly made to Chandra White. Second of all, there was no credibility finding in terms of Chandra White's testimony at the time of trial, and even had there been, that doesn't mean that everything she says now is a lie. I don't think that the Court is allowed to go to that point and say, well, I thought she was not particularly credible during the trial, so no matter what we ever see from her in the future, we're not going to believe it. I think that we have to look at the declaration that was submitted, and as I argue in my brief, there are some indications in that declaration that support the credibility of it, in particular, the fact that she said the statement of, I don't want to give you my information, you know, have the defense lawyers contact me, get the information from the Court, that seems, having done this for a very long time, that seems just to me to be a little bit of a misrepresentation of what might have been a little bit of a misrepresentation of what might have been a slightly awkward situation. Okay, I'm going to move on to your counsel. We know that the, one thing that we do know in this case is that the trial judge dismissed her as a juror because she claimed an inability to discharge her duties in light of her religious views, right? Yes, Your Honor. Now, when she was sworn in as a jury before the case began, she had those same religious views. She did, Your Honor, according to the record we have. And she didn't raise any objections. She didn't say, I cannot judge anybody else. And two other jurors did say that. So we know then that her statement to the judge that she could not be a good juror because of her religious views is not true. There had to be something else, right? That certainly was the impression that the defense counsel received. I'm not saying that Judge Hill was. Well, it was a, the questions that the court asked, the jury, the counsel asked during the interview with the judge didn't develop that idea that she was not telling the truth when she said that her religious views did not permit her to be a judge in this case. And because she had those great religious views, she did not want to put blame on anybody else. She didn't want to blame other jurors for their anti-American views, bias. I think that is certainly a fair analysis from the facts in the record. And one other thing that was at least of interest is the fact that she was clearly deliberating and sending out notes until later in the process. And so this idea, the idea that suddenly she realized that her religious views prevented her from doing this at least might, might give way upon a further investigation. We might find out that there was perhaps more going on behind this statement. She did not, she could not, she could not judge anybody else. That is what she told the court. Yes, Your Honor. Good morning. Good morning. Richard Rome. I'd like to address a couple of issues. We have a lot of issues, but focus on a couple of the main ones. Preliminarily, I'd like to indicate to the court that the government has agreed with respect to a sentencing error. All right. And who do you represent? I'm sorry. Audra Israel. All right. Thanks. Richard Rome, if I didn't identify. Yeah, you said that. The court has agreed that there was a sentencing error. I just wanted to point that out. Right. With respect to the term of supervised release. So there's an agreement. I guess the government's conceded it is what you're saying. Yes. Okay. We saw that, yes. Very good. Briefly, I'd like to first address the issue of the confidential witness who was precluded from testifying. The defense made a written, actually three times brought it up prior to the trial, and then a written motion, an in limine motion to. Well, I wanted to ask you one thing, though, just really quick. Yes. Did you, I noted in the record that Israel's commitment order says that she pled guilty. Did anyone correct that in the record? Because she had a trial. She did go to trial. I don't recall seeing that in the commitment order, but if there's anything, no, that definitely went to trial. All right. Well, you might want to, you might want to look at that, and if, when you correct the rest, you might want to correct that, too. Thank you. The court precluded a confidential source from testifying, and it's the defense position for all the defendants that this was a key witness who could have helped exonerate the defendants because it was somebody, at least with respect to Ms. Israel, who could have shown that she was not involved in this conspiracy. The primary evidence against her related to some tape recordings, and in essence, the confidential source could have shown that Ms. Israel was not involved in meetings, her phone number wasn't called, or her automobile wasn't seen at various meetings. And it's our contention, when you look at what the legal standard is, that that evidence should have come in, and it would have just been corroborative and additional evidence to show of her non-involvement in this alleged conspiracy. It's true that there is a limited privilege in keeping the sources confidential, but you have to balance the extent to which disclosure helps the case versus the government's interest in protecting. Well, they were willing to concede that there was no contact, though, right? When you say they, you mean the government? Yes. That you could have done that by stipulation, but your client didn't want to do it that way. Right. I mean, the defendant wants to put the case on, not have a key element of her defense stipulated away in a piece of paper somewhere. So it's always more important, I think, to have the agent, somebody who's on the ground, involved in this investigation, come in and say, she wasn't involved, rather than a stipulation. Well, no, but she wasn't charged with any of the sales with this CSI, right, or whatever. Did I say that right, or am I just talking about the program? It's close enough. Yeah. Well, it was, the thing was, it was, the charge was conspiracy. So it's all kind of, you know, there's all kinds of conspirators out there in different parts of this conspiracy. So it, to the extent that her co-conspirators were involved in these transactions, it brought her into the transaction, too. So it's relevant to that extent. Counsel? Yes. Would the confidential informant have attested to anything other than lack of contact? Does Israel suggest anything else that would have been testified to? Well, I think primarily, you know, lack of contact, lack of phone numbers, lack of an automobile, I mean, a whole series of things that relate to that point, Your Honor. That was the primary offer of proof. Thanks. I'm running, I'll move on quickly to the next issue. Take a minute, and then we'll give the rest of the time to, I'll give five minutes to the other defendant. Okay, thank you. So with respect to that, I think that, you know, when we're involved in a serious drug case, that if there's going to be any benefit of the doubt, it should obviously go to the defendant with respect to what witnesses can be called. I'd like to address, just lastly, this issue of the government expert who testified regarding drug phrases, and I'd like to just deal with that for a few moments. It's our contention that there was an insufficient foundation to allow that testimony to come in. Now, there were, the testimony went on for extensive, I think the transcript covered approximately 100 pages, and there were numerous objections, and there was a voir dire of the witness, but the point that I would just like to point out without going through, I mean, I've cited into the brief, there's numerous portions of the record that deal with the specific questions and some of the general questions, and that's pretty much contained roughly on page 35 of the brief and thereabouts. And the key here appears to be what methodology is an expert going to use when he reconstructs a drug conversation. And I just, I cited on page 35 and 36 of the brief as to the questions that related to the methodology, because what happens in these types of cases is you have an expert who looks at a tape conversation, and in essence... Well, I think you made your arguments in your brief, didn't you? Okay. Yes, I think I want to leave a little time for your question, Mr. DeCute's counsel. Thank you very much. Thank you. Any other questions or anything else? It doesn't appear to be. Thank you. Thank you. All right. I'm going to give you five minutes. Thank you, Your Honor. My name is Vincent Oliver, and I represent Mr. Cedric DeCute in this matter. My comments will be limited to the search of the briefcase that was found inside of his car at the time of his arrest. And I think several issues are presented by that scenario. First of all, he was, it was a valid stop. He had violated some traffic law. The, he was found to have a suspended license, and there were some warrants out for his arrest. There was a locked briefcase inside of the car. He denied the ownership of that briefcase. Well, that caused him problems later because the court said he didn't have any standing, right? That is correct, Your Honor. And then there was the inventory search issue, so. That's correct. I believe that he did have the standing, Your Honor. The appellee says that he didn't have standing, and they analogize it to the Gonzales case where there was a search of some luggage that was on a bus. That case is different than this case because the baggage could have belonged to somebody else. There were other people at the bus station. In this particular case, Mr. Ducoud was alone in the car, and there were no other persons to whom that bag could have belonged other than to a person that had entrusted that bag to Mr. Ducoud. Which is what he said. It belonged to the owner of the car, right? Exactly. Well, I would argue that he would have a, certainly a reasonable expectation of privacy in the sanctity of that bag as a bailee, if nothing else. Do you have any cases to support that? I don't, Your Honor, but I just think it's a logical extension of the law as it exists. I believe that he does have standing, and that, assuming arguendo, that there is a Well, if I were to use your language, would then, if we were to find that he did have standing, would that have to be an extension of the existing law? I believe so. Okay. Well, there was no evidence brought to the court about any kind of standardized inventory test employed by the police department, so the, it could not, the search could not be justified on that basis, and that leaves only one other basis, and that is that the dog alerted on the suitcase, the narcotics dog alerted on the suitcase. Again, that is not, that would have given them sufficient probable cause to get a search warrant, but not to search the briefcase out in the field. Counsel cites the case of Sandano-Ariana, but that's a little bit different. That was a search which took place at the border, and, you know, a gas opening for a gas portal is different than a locked briefcase. I would submit it on that basis, Your Honor. All right. Thank you. Thank you. Good morning. Good morning. I'm going to place the court Craig Misaki on behalf of the United States. I'd like to... Just quickly while we have you on the point on the, if the court were to, if you get over the standing issue, was there evidence in the record that, of what the inventory search process was for the California Highway Patrol? Yes, Your Honor. The inventory, the written inventory policy was included as part of the motion. All right. I just wanted to make sure on that. Okay. Thank you. I'd like to address the points raised by defense counsel, starting with what appears to be the most interesting issue, that's the jury misconduct issue. If there's even a hint of racial prejudice in a criminal case, would the government be satisfied with just ignoring it and going about its business? Or does the United States of America believe that if there's a hint of racial prejudice that that should be examined very carefully and very studiously? And if it was, corrections should be made? Isn't that the America that we all believe in? Your Honor, that's an excellent question, and I'd like to answer it this way. The Ninth Circuit has already addressed that specific issue in the Woodruff case, where a declaration... I'm sorry. The Ninth Circuit has already addressed that issue in the Woodruff case, where a declaration was filed that contained what you might describe as a hint of racial prejudice. That court, however, concluded the declaration was insufficient to justify a hearing. So this circuit has taken the position that it takes more than a hint to get over that threshold and require an evidentiary hearing. And at first glance, that might sound odd, but I... All I'm suggesting is that we look into it. We don't take anybody's word for it, but we look into it and settle the issue completely and finally so that there cannot be any possible or probable racial prejudice. Your Honor, I understand the Court's point exactly. But if we were looking at this in a vacuum, I'd say the Court was correct, but we're not. We're looking at it... We're looking at... There are two competing interests here. On one hand... I'm not looking at the vacuum. I'm looking at the record. No, I understand, Your Honor. I mean, briefs have been written and statements have been made and questions have been asked and answered, and that's not in a vacuum at all, counsel. Believe me. Your Honor, I probably shouldn't have used that term, but what I meant to say is there are two competing interests here. Actually, it's more than that. It's insulting to think of the judge asking questions in a vacuum. I clearly gave the wrong impression. I didn't intend to do that. What I simply meant to say is on one hand, we have the Sixth Amendment, a defendant's Sixth Amendment right to an unbiased jury, which is clearly important. If we were only looking at that one particular issue, I'd say the Court was correct, but we're not. Against that, we have to balance the interests and maintain the secrecy of jury deliberations. And that's an interest that's also very important. It's been recognized for more than 200 years as an important policy consideration. This Court itself in the Symington case went to great length in describing the importance of the policy that underlies 606B. So now we have two competing interests. We have the Sixth Amendment interest over here, and we have the importance of juror secrecy on the other hand over here. So balancing those two interests, the courts have decided, and there's a long history of this, that you need more than a hint. And that's what all of the cases have suggested. This is one thing that's a little bit different about this case, and I'm not sure exactly how to put this in perspective, but this is a juror that did not sit. All right. So a lot of times when we have motions after to examine a juror, it's a juror that decided guilt or innocence. This is a juror that asked to be removed, and then other jurors went on. That's a key statement. It's, you know, how do you, I mean, that's not usually what you see in the cases where you're examining jurors after. That's correct, Your Honor. That's a key point, because in this case, the juror left in the middle. So what, playing this out, if this juror was to come back in and make some statements about what occurred in the jury room before she left, the next step is to go bring out the 12 other jurors and ask them questions about their deliberations that occurred after she left. And clearly, that has to fall within 606B. So you're asking the juror to talk about what happened before she left, but when the critical inquiry is everything that happened after. And it's simply impossible to make that inquiry without violating the very important, the letter of 606B and the principles that underlie it. So I think that's a critical distinction. I had not seen that particular set of facts in any other case that dealt with that area. Counsel? Yes, Your Honor. Does your argument suggest that if, in fact, there was racial bias going on, and this was proved, that we would care what happened in the subsequent deliberations? No, Your Honor. I'm not suggesting that at all. I believe you can recognize, you can read Rule 606B according to its plain language. And if you do so, jury deliberations and what goes on in the jury room would be clearly incompetent, would be excluded. You can also demonstrate a Sixth Amendment violation if you had a biased juror, a racially biased juror. That's the standing. 606B goes to the type of proof that we are going to allow in our jury system to prove that Sixth Amendment violation. So I'm not saying at all. They're two completely distinct issues. On one hand, you have 606B, which goes to the competence of evidence that could be admitted. On the other hand, you have a potential Sixth Amendment violation, which is something completely different, where a defendant could come in and prove that with evidence that had nothing to do with what went on in the jury room. For example, there was a case that involved a witness in a trial. This was the Williams v. Price case, written by now Justice Alito. In that case, you had a witness who overheard a juror say something racist in the courthouse lobby, and that evidence could be brought in, outside of 606B, to demonstrate, I think, the kind of Sixth Amendment violation that the Court just alluded to. So the government's basic point is that if we read 606B in keeping with its 200-plus year history, if we read it in keeping with the plain language of the statute, if we read it in keeping with, really, all the cases that have looked at the issue and decided it, and if we read it in keeping with Supreme Court precedent on point, it's fairly clear that evidence of racial bias does not fall within either one of the exceptions recognized in the rule. Now, the only bump in the road is the Henley case, and I'd simply like to briefly suggest why the Henley case is not a good guide in this area, for a variety of reasons. First, the holding in Henley that 606B can never exclude evidence of racial bias was not part of the holding. It was dicta. Two, the Henley case, in coming to that conclusion, relied on a single footnote in a Supreme Court case, the Russian case. And if one reads that case, you recognize that the Supreme Court was not talking about the same issue we have here today. The Supreme Court was dealing with a very common issue where a juror had an outside experience that the Court thought might impact their impartiality. So the Supreme Court itself in the Russian case did not deal with this particular issue. And it's a very important issue. So if the Court in this case were to recognize an exception to Rule 606B that is not in keeping with its history, its language, or even its legislative purpose, its legislative history, the United States Congress, the House passed a version, and then it was changed by the Senate, and the Senate version clearly indicates that it was meant to exclude the very kind of information we're talking about here. If we're going to ignore all of that and write an exception to 606B to four racial bias issues, I think we're – I think that we should engage in at least a textual analysis of the rule, which the Henley case simply did not do. And they didn't have to, so there was good reason why they didn't. But what if she appeared with a sworn statement by one of the jurors that the reason that she was prejudiced against and forced to remove herself from the jury was because she was an African-American? There are. This sworn statement was before a district attorney. Mr. Your Honor, the declaration that was provided made no mention. What should we do in that case? Well, I think the – Nothing? No, Your Honor. I think the case is – We should do something, right? And what should we do? Well, I think we have to decide whether or not – there are a couple of things we can do. We have to decide whether or not something that was said in the jury room, whether or not that reflected outright racial prejudice. We need more information, don't we? Not necessarily. Not necessarily. Why not? Well, I think there might be situations potentially where if a racial epithet was used in a – in a jury deliberation, then that in and of itself might – I mean, it's perfectly okay for the government to say that people are sent to prison because their jurors are racially biased against them. Absolutely not, Your Honor. I'm not suggesting that. Well, we should – if that's a hint, we should explore it to find out whether it's true or not, shouldn't we? That's why this issue is so interesting. The courts have really required more than a hint. And I understand the court's concern, but again, we're not dealing with just the issue of the Sixth Amendment. We're dealing with the issue of juror secrecy here. And in this case, if we look closely at Ms. White's declaration, she did not mention anything about a racial epithet. In fact, Chandra White states Ms. Bailey didn't say anything about racial bias. In fact, it was Chandra White who inferred that from Ms. Bailey's comments, whatever they were. So in that situation, I think we have a case very similar to the Woodruff case, where the declaration is submitted, and if you accept it as true, it's just too vague and ambiguous to justify the drastic step of breaching jurors – the secrecy of the jury room, especially here where the juror had already left and we'd be talking about deliberations between 12 jurors after she left. Why would she have a change of heart concerning her duties as a religious person before she was sworn as a juror and then when she was deliberating as a juror? There had to be something else. Shouldn't there be? I mean, doesn't common sense tell you that something occurred in that interval that caused her to change her mind that she was not – she didn't want to be a juror anymore? Two possible things could have happened, Your Honor. There could have been pressure put on her by the other jurors, and that's clearly incompetent evidence under 606b. The other possibly – possible scenario is that when she went into the case, she had not heard any of the evidence. She did not hear how strong it was against the defendants. Maybe in her mind she didn't think she was ever going to have to pass judgment on somebody, that she could vote to acquit. But then once she got into the jury room, after she had heard the evidence, after she had heard the views of the other jurors, she decided if she was going to stay in that jury room, she was going to have to vote guilty as well. And she could not live with that. In fact, that appears to be what happened because – Well, she was going to vote not guilty then. Well, maybe she couldn't – She was going to vote not guilty. That's a prima facie case of jury misconduct. I don't believe that's correct, Your Honor. But I don't think she – maybe in her mind, in her good conscience, she could not vote not guilty considering the evidence. That's just as likely a scenario. Where do you get that idea from what she said? Well, she said that in the declaration, she allegedly said that she was the only holdout juror for acquittal. In other words, the other 11 were going to vote to vote for guilty. So under those circumstances, she had two choices. She could stay there, hold out, and hang the jury. If she wasn't – if she wasn't attacked verbally or – Well, there's no evidence she was attacked verbally whatsoever. There's no evidence of that. And I think that's the point here. Do we want to open up everything that happened in the jury room for public scrutiny to find out what kind of pressure, if any, was being put on her? And that's the very reason why 606B is so important. Well, we got one juror who hints that that happened. Well, there was a hint that maybe she was – the pressure was being put on her because of her views of the case. And that's entirely proper. We can't allow jurors – I think it's a very dangerous situation if we allow jurors after a verdict has been rendered to do what this juror did here, to upset the apple cart. I'm not talking about race, Counsel. Maybe religion. But right now, only race. Well, I understand that. But the – she never said that there was any racism in the jury room. She said the pressure – she implied, anyway, that the pressure was somehow race-related. She never said that. It was inferred by Ms. White. But – We don't have the juror's declaration. We have Ms. White's interpretation of it, correct? That's correct, Your Honor. That is correct. And as a – I'm sorry, Your Honor. Yes. I had a question. What if Juror Bailey had come to the judge and said, look, I'm black. They're black. I just can't convict one of my fellow persons. So let me off. Now, would that be appropriate for him to let her off? I believe it would be appropriate, because under those circumstances, the juror is essentially coming in and telling the court that she is unwilling to decide the case based on the facts of the law, that she is going to make her decision based on a completely irrelevant ground. And I think there are cases specifically that deal with that situation. I can't remember the situation. I'm sorry, Your Honor. We do have jury nullification occasionally, and that stands. Isn't that right? That's correct. When jury nullification, an issue that is brought to the court's attention, that is a valid basis for excusing a juror. It seems to me in this case, this is perhaps the more likely scenario, that she just couldn't bring herself to convict a fellow black. That's the way it strikes me, Your Honor, based on what was said and based on what occurred and based on the strength of the evidence. It's very troubling. We don't know what to do, frankly. Well, this is a – more than one court has described this issue as a knotty issue. But I think in this case, it's not as difficult as it may appear at first blush, because we have a juror that left in the middle of deliberations. They can't say anything about what happened after she left. And, in fact, it's fairly clear that the jurors continued to deliberate after she left. They asked for evidence. They listened to tape recordings. They made specific findings about drug quantity. This is all after she left. So it appears that the deliberations did continue. Two, I think – How long was it before there was a verdict of guilty? I'm sorry, Your Honor? How long after the – her replacement was sworn in was there a verdict of guilty? Your Honor, I wasn't there. I believe it came the – she was excused on, say, day one. And the verdict – in the middle of the day, I believe the verdict came back on the morning of day two. That's my recollection. How long – my question, frankly, was how long did the jury deliberate when the alternate jury was sworn in? Your Honor, I don't have a specific time for you, but I know it was more than a nominal time. It wasn't as if – A couple of hours? A couple of days? I believe – no, it was not more than – it was more than a couple of hours, I believe. It was not more than a couple of days. I just wanted to also address the issue of the confidential source, unless there are any questions about the jury misconduct issue. This was a case where everyone conceded that the confidential source had no contact with Ms. Israel, none whatsoever. This is not a – in that sense, it's similar to a lot of other conspiracies where the confidential source has some contact with some members of the conspiracy and is used to obtain a search warrant, for example, or in this case, a wiretap. And that's exactly what happened here. Confidential source was used to, in part, to obtain a wiretap. And then that confidential source went out of the picture. The evidence against Ms. Israel consisted solely of observations and intercepted phone conversations. The confidential source could have said nothing one way or another with respect to the content of those intercepted phone conversations. So there was really, to the extent the court balanced the need for the evidence against the importance of maintaining confidentiality, there was really nothing on the defendant's side of the scale. And I believe the court made the correct decision there as well. Finally, I see I have a couple of minutes left. I'll address briefly the issue of the search for Mr. Ducoud. And I'd also like to address the issue of Mr. Ducoud's sentence, because there appears to be some confusion in the briefs about that. First, with respect to the search, the judge found that he did not have any standing. And that was based on his clear statement that the briefcase did not belong to him, but it belonged to the owner of the car. And that alone was sufficient evidence. Well, counsel, I believe there is. Am I remembering that there's a case that says if you claim it's not yours, you lose all standing? Do you know what that case is? I think it's the bus case that was mentioned earlier. No, I think there's another one that was involved, a guy's briefcase in his car. Your Honor, the Colbert case stands for that proposition as does the Jackson case, that words alone, denial of ownership is sufficient to show an abandonment and a lack of standing. I had another question which hasn't been addressed except in the brief, and that is the difference between crack and base and powder. Can you talk to us about that? Yes, Your Honor. That was the sentencing issue I wanted to get to. With respect to Mr. Ducoud's sentence, he was given a 20-year sentence, and there seems to be some confusion over how that sentence was calculated. Mr. Ducoud's sentence was based on a couple of things. The jury found that he had conspired to possess and distribute more than 50 grams of cocaine base. Under the statute, that would qualify him for a 10-year mandatory minimum sentence. He was also charged with being a felon in possession of a firearm after a prior drug-related felony. The jury found him guilty of that as well. The government filed an 851 information which then made him eligible for the 20-year mandatory minimum sentence under 21 U.S.C. 841. So his 20-year mandatory minimum sentence was based on the jury's finding of more than 50 grams of cocaine base. The government's filing of the 851 enhancement information and the jury's finding that that prior conviction was, in fact, true. There appears to be an issue about whether or not the cocaine base that the jury found was, in fact, cocaine base or crack or whether it was cocaine in the powder form. Now, Mr. Allard was not the trial counsel, so he did not know. He wasn't there. But the evidence at the trial was that the cocaine base found in the briefcase in Mr. Ducoud's truck was cocaine base in the crack form. The expert ---- Can you explain that better to me? What's the difference between base and crack and powder? Well, in common terminology, a base ---- cocaine in the base form, which is cocaine that has been ---- powder cocaine that has been taken and processed, it's heated up, impurities are drawn out, and then it's dried into a hard form. And then it can be cracked. That's where the term comes from. It's cracked because it's hard. And then once it's in this hard form, it can be smoked. By contrast, you have powder cocaine that is not smoked. It's taken through the mouth, through the nose. So when we're talking about crack ---- I understand both of those concepts, but I don't understand what base is between the two. Cocaine in the base form refers to powder cocaine that has had these impurities taken out and processed into this rock solid form is what cocaine base refers to typically. There appears to be some confusion in the cases over whether or not cocaine base could also include cocaine in the powder form. But all the evidence at trial was that the cocaine base involved in this case was in the crack form. There was a chemist that testified that the cocaine base found in the truck in the briefcase was cocaine base was crack. And then the expert witness testified that the conversations that were intercepted between Mr. Ducoud and Mr. Page also were referring to cocaine base in the crack form, which is also referred to as rock cocaine. Why do they ever use the term base if it could mean either one? I don't understand that. Well, the term ---- I don't know the history of the drafting of that section. The section refers to cocaine in the base form. I suppose part of the problem is the statute may be having a hard time keeping up with slang terminology that is used to refer to cocaine in that form. But in this case, it was fairly clear that when referring to cocaine base, it was referring to cocaine base in the crack or rock form. All right. Did you have anything else that you wanted to wrap up on the sentencing part of it? No. With respect to sentencing, that's all I wanted to say, Your Honor. Thank you. You're about three minutes over. I know we've been over on both. Is that what that means? I've got three minutes left. Yeah. Unless there are any other questions, I'll sit down. Thank you. All right. Well, I mean, I'll allow you another minute if you need to wrap because I'm going to give them just a total of two minutes rebuttal. Okay. No, thanks, Your Honor. All right. Thank you. All right. I'm just going to give you two minutes rebuttal. So I'm assuming that Ms. Ivins has taken it. At ER 75, we have Chandra White's declaration, and it doesn't say I inferred. It says she implied. And she's talking about what Juror Bailey implied. And it says Ms. Bailey did not want, wish to go into detail. So we really do have a very limited record, unfortunately, from which to make these very important decisions. I think that I would invite the Court, though, not to reach all of these very important decisions in this case. I think that a remand for factual development is what's important here. Imagine that Juror Bailey walked into the courtroom. I mean, we don't know what happened. She walks into the courthouse, and she heard some jurors talking, and she doesn't even know they're going to be jurors. So we're not in juror deliberations. And she heard them make comments, and she didn't mention it. And then once she's in the jury room, she realizes, maybe they did really mean those horrible things they said, or maybe I didn't mishear that. And when they start putting pressure on her, she draws that inference and asks to get off. We don't have enough facts to know if there were racial things that happened during jury deliberations, outside of jury deliberations, before the trial started. Just that minimal amount of factual development is what needs to happen in this case to assure ourselves that these defendants received a fair trial as guaranteed by the Constitution. Counsel, if her true reason was that she just could not bring herself to convict a black, is that a proper basis for releasing her? I think that the U.S. Attorney addressed that correctly, which is she does have to be willing to base her verdict on the evidence. And if that had come up at the time, the judge would have been ‑‑ I'm sure she would have said, do you understand my instruction? My instruction is that you must, you know, reach a verdict based on the evidence before you. Can you do that? And at that point, they would have had that discussion. And if she said, well, yes, I can, based on the evidence, I can't bring myself to convict these defendants, that would have been a very different statement than I can't do it because they're black. And we don't quite have those facts, and we don't know. That may turn out to be what happened. It may also turn out that there were some articulate racist jurors on this jury, and it's that possibility that we at least have to explore before we let this conviction sit for all time. And I believe my co‑counsel just had one quick comment on the base cocaine issue. Well, it better be quick. I'll follow up. Unless Judge Fletcher wants to hear about it. I think she might. I think both the term of base and the term crack are colloquialisms or slang expressions which have no scientific meaning. The powdered cocaine is an acid-based water-soluble product that usually is ingested through snorting or through the nose or any kind of mucus method. I understand what base is, and I understand what crack is, but I don't clearly understand what base is. There's a chemical process which transforms it from an acid to alkaloid, and they say it frees it of its acid base. Hence, I think the expression base is derived from that. Thank you. All right. Thank you. These matters will now stand submitted. Court's adjourned until tomorrow morning at 9 o'clock. Thank you.
judges: B. Fletcher, Ferguson, Callahan